382 So.2d 169 (1979)
James E. FITZMORRIS, Jr.
v.
Louis J. LAMBERT, Jr. et al.
No. 13282.
Court of Appeal of Louisiana, First Circuit.
November 16, 1979.
Writ Refused November 17, 1979.
*170 John R. Martzell, Lawrence J. Smith, New Orleans, Rolfe H. McCollister, Baton Rouge, for appellant.
Gibson Tucker, Jr., Gilbert V. Andry, III, Leroy Hartley, New Orleans, Michael A. Patterson, Baton Rouge, Steve A. Marks, New Orleans, for Louis J. Lambert, Jr.
Martin L. Feldman, Ben C. Toledano, New Orleans, and Cyrus J. Greco, Baton Rouge, for David Treen.
Kenneth C. DeJean, Asst. Atty. Gen., and John D. Koch, Baton Rouge, for appellees.
En Banc.
PER CURIAM.
In this suit plaintiff, James E. Fitzmorris, Jr. is contesting the result of the recent gubernatorial primary held in this state. The original defendants were Louis J. Lambert, Jr., one of the candidates for governor; H. M. "Mike" Cannon, Clerk of Court of East Baton Rouge Parish; and Paul J. Hardy, Secretary of State of Louisiana. Subsequently, David Treen, the leading candidate in the primary was joined as a party defendant.
In his various pleadings, Fitzmorris alleges a number of irregularities in the conduct of the election, and prays for a recount of the absentee ballots; that certain provisions of the Election Code be held unconstitutional; and that he be certified as a candidate for Governor in the December 8, 1979, general election, or, alternatively that a new primary election be held.
Pursuant to R.S. 18:1451 et seq., the recount of the absentee ballots was conducted by the trial court, and the following results were certified to the Secretary of State: Fitzmorris, 6403; Lambert, 4296; Treen, 11,325.
*171 Exceptions of no cause of action, prescription and to the jurisdiction of the court over the subject matter of the case were filed on behalf of defendants Lambert and Treen. The exceptions of no cause of action were overruled, and the other exceptions were either referred to the merits or not specifically disposed of. Issue was joined as to Lambert and Hardy. Cannon waived his appearance. Treen filed no answer, but participated in the trial of the case on the merits without objection.
After plaintiff rested his case, defendants Treen and Lambert made oral motions for a directed verdict under Article 1810 of the Code of Civil Procedure, which were granted by the trial judge.
From the judgment dismissing his suit, plaintiff has appealed. Defendant Lambert has answered the appeal, asking that certain rulings of the trial judge be overruled.
The relief which can be afforded by the courts in an election contest is set forth in R.S. 18:1431 and 1432, which provide:
1431. When the court finds that one or more of the votes cast in a contested election are illegal or fraudulent, the judge shall subtract such vote or votes from the total votes cast for the candidate who received them if the contest involves election to office, or from the total vote for or against a proposition, if the contest is of an election upon a proposition. If the court determines that legal votes cast in the election were excluded in the total votes cast on a candidate or proposition, then these excluded legal votes shall be added to the total votes on the candidate or the proposition to which they are attributable. Thereafter, and after considering all the evidence, the court shall determine the result of the election.
1432. The final judgment in an election contest shall declare the election void if: (1) it is impossible to determine the result of election, or (2) the number of qualified voters who were denied the right to vote by the election officials was sufficient to change the result in the election, if they had been allowed to vote, or (3) the number of unqualified voters who were allowed to vote by the election officials was sufficient to change the result of the election if they had not been allowed to vote, or (4) a combination of the factors referred to in (2) and (3) herein would have been sufficient to change the result had they not occurred.
Since the matter is before us on a judgment sustaining a motion for a directed verdict, we are called on to decide if plaintiff has made out a prima facie case under either of the above two provisions. If so, we must remand the case so that defendants may put on their case. If not, we must affirm the judgment rendered below.
Plaintiff first complains that the motion for a directed verdict is an inappropriate vehicle for the disposition of an election contest, because the judgment is not definitive of the rights of the parties in the event of a reversal, but must be remanded for a further trial. It is argued that such a procedure is inconsistent with the necessity for a speedy disposition of the case on its merits.
Article 1810(B) of the Code of Civil Procedure provides:
In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence.
We see nothing inappropriate in the use of the above procedural device. If, in fact, plaintiff is not entitled to the relief sought, the motion for a directed verdict is the most expeditious device which could be used.

ASSIGNMENT OF ERROR NO. 13
Appellant contends that the lower court erred in overruling his attack on the constitutionality *172 of La.R.S. 14:1405(B)and 1409, which provisions prescribe the time limitations for commencement of an election contest[1] and time limitations on trial and appeal.[2] He avers that these provisions are unconstitutionally vague and deny to him the equal protection of the law. In support thereof, appellant cites the Due Process and Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article I, Sections 2 and 22 of the Louisiana Constitution of 1974.[3]
We begin by noting that every statute is presumed to be constitutional and this court, is therefore, bound to uphold the same when it is reasonably possible to do so. Sevin v. Louisiana Wildlife and Fisheries Commission, 283 So.2d 690 (La.1973). The burden of proof rests heavily upon one who attacks the statute to establish its unconstitutionality. Jefferson v. Sharlo Corporation, 283 So.2d 246 (La.1973).
Here the legislature has enacted an election code which provides, inter alia, for the procedure for election contests. The contested sections spell out plainly the time limitations. In his original "Petition Contesting Election", appellant alleged in Paragraph 16 thereof that the statutes challenged did not accord adequate time in which to discover and list discrepancies prior to completion of the tabulation. The crux of the allegation was to put the lower court on notice of his need to amend and supplement the pleadings and to reserve that right. An examination of the record herein shows clearly that the lower court permitted no less than six supplemental and amending petitions to be filed and admitted *173 evidence thereon. Under these circumstances, it is clear that the appellant has not carried his heavy burden of proving that the statutes complained of are unconstitutional either facially or in their application, nor do these statutes offend the adequate remedy requirement of Article I, Section 22 of the Louisiana Constitution of 1974.
The Court recognizes that the legislature in drafting and enacting the present Election Code sought to expedite contests of this nature. The integrity of the election process mandates the same. The fixing of time limitations is vested solely in the legislature.
We find no error of law in the holding of the lower court.
In order to consider plaintiff's other assignments of error, it is necessary to detail the method of voting in this state. The procedure to be followed when voting, calls for a voter to identify himself to the commissioners at his polling place. His name is recorded by the commissioners and he signs either a card containing his voting record or a computer list of voters qualified to vote in that precinct. The commissioners will also sign and date the document signed by the voter. The voter is then permitted to enter a voting machine and vote. The records kept by the commissioners indicate the number and identity of the voters voting in any election.
The voting machines have two counters which indicate the number of voters who have voted in that machine. The first of these, which is set at zero before every election, is the public counter, which is activated by the red switch which closes the curtain on the machine. Once the red switch is operated, the voter must vote for at least one candidate or proposition before he can return the red switch to its original position and open the curtains to the booth. The public counter indicates the number of people who have entered the machine.
The other counter is known as the protective counter. It keeps a running total of the people who have voted in the machine in all elections in which it has been used.
The number on the protective counter is recorded before the voting machine leaves the warehouse to go to the polling place, again after the polling place closes, and again when the machine is returned to the warehouse after the election. The difference between the two numbers should equal the number shown on the public counter after each election.
After the polls are closed on election night, the commissioners open the machines and record the votes registered for each candidate on each machine. They also record the number shown on the public counter and the closing number of the protective counter.
In an election in which all voters who sign the list actually vote for all offices being contested, the number of votes cast for all candidates for any office should equal the number of people who sign up to vote and the numbers shown on the public counters of the machines at the polling place. These in turn should equal the numbers of voters as indicated by the protective counters on the machines.
The record indicates that it is not uncommon for voters not to cast a vote for all offices being contested, so that the total vote for any office may be less than the number of voters shown by the public and protective counters. It is also not uncommon for a voter to sign up to vote and leave without actually entering the machine. It is apparently also possible, though unlikely, for a voter to enter a machine and cast his ballot without being recorded on the list by the commissioners. We also note that it is possible that there be a malfunction of the public counter, the protective counter or the counter for a candidate. All of the counter mechanisms on the machines are independent of each other.
After the votes are recorded by the commissioners, the machines are sealed and returned to the warehouses. On the Tuesday following the election, the seals are broken, the machines opened and the various totals are checked against the figures turned in by the commissioners. The totals found on the machines at this time are the official figures used in making the election returns.
*174 Plaintiff has introduced evidence as to a number of alleged irregularities. He has attempted to show a number of cases in which there are discrepancies between the public counter and protective counter readings. It is contended that such discrepancies reveal either a machine malfunction or tampering, and that all votes on such a machine should be thrown out. He has offered evidence that a number of machines were unsealed and open when the warehouses were opened on the Tuesday after the election. It is contended that the votes on these machines should not be counted because of tampering.
Plaintiff has also attempted to show a number of cases in which there were more people voting in a precinct than signed the poll list; and in which more people signed the poll list than voted. It is contended that, in the first instance, the extra votes are illegal, and, in the second, that some voters were prevented from voting, either by machine malfunction or by some illegal activity.
In this court, plaintiff does not seriously contend that he is entitled to any relief under R.S. 18:1431. However, he argues that he has proved a case under R.S. 18:1432, because of illegal votes which were counted, qualified voters who were prevented from voting, and that the votes cast on many machines should not be counted because of irregularities in the election process. He argues that the number of votes affected by the alleged irregularities exceeds the difference in the vote between himself and defendant Lambert, and that it is therefore impossible to determine the result of the election.
The various irregularities will be hereinafter examined in detail, but it is necessary that we first address ourselves to the burden of proof necessary in such a case. As outlined above, the voting procedure admits of both human and mechanical errors which would not constitute serious irregularities and which would not necessitate the invalidation of the vote in a particular machine or precinct.
For instance, a difference between the public counter and the protective counter can be explained by a mechanical malfunction, and, according to the expert testimony, is not an unusual occurrence. It is also possible that figures could be transposed by the commissioners in making their returns. Fewer votes in the machine than people who signed up to vote can be explained by impatience of those who would not wait in line to vote after signing to do so. Missing seals on the machines and open machines can be explained by commissioners who are not properly trained or who do not do their jobs. Of course, all of these things can also take place because of illegal conduct on the part of commissioners and other election officials.
We think that, before any determination of serious irregularities can be made, it is necessary that evidence be produced as to all elements of the voting procedure, and as to all of the documents relating to the precinct involved. A showing that a machine was not properly sealed is no ground for disallowing the votes cast therein unless other factors indicate some illegal action or tampering. The same would be true as to differences between the public and protective counters, with no other evidence of impropriety adduced. It is within these guidelines that we will consider the evidence in this case.
In our consideration of the various specifications of error, we have considered all of the proffered evidence which was excluded by the trial judge. Because of the exigencies of time in a contest such as this, and because of the difference in the burden of proof resulting from the change in the law relative to election contests, we are of the opinion that none of the said testimony should have been excluded on the grounds of lack of specificity of the pleadings.

ASSIGNMENTS OF ERROR NOS. 3, 4, 5, 6, 7 & 8
Appellant's assignment of errors 6, 7 and 8 concerned the trial court's exclusion of evidence regarding East Baton Rouge Parish: *175 that in Wards 2 and 3,582 fewer persons signed the computer voting list than cast votes; that 204 more persons signed the computer voting list than cast votes and that the count on the public counter deviated from the count on the protective counter. Appellant has accepted the count on the public counter as being the number of votes cast.
The election code in R.S. 18:1406 A[4] requires that plaintiff allege irregularities in detail. The requirement in the previous law was for the allegation to be in specific detail. However, in Garrison v. Connick, 291 So.2d 778 (La.1974) under the latter requirement, the Supreme Court reversed the lower courts' holding that pleadings without specific details failed to state a cause of action.
We therefore believe that the trial court was in error in excluding the evidence in regard to the alleged irregularities in some precincts in Ward 1 and all precincts in Wards 2 and 3. While the allegations of paragraphs 8(c) and (d) of the original petition[5] and paragraph 28 of the sixth supplemental petition[6] may have been vulnerable to an exception of vagueness, we think the trial court was in error in excluding the testimony. We have, therefore, considered the evidence in the offer of proof in arriving at our conclusions.
In assignment of errors 3, 4 and 5, appellant complains of the trial court's failure to find serious irregularities in Ward 1 of East Baton Rouge Parish in that 1088 more voters cast votes than signed the computer voting list; that 433 more persons signed the computer voting list than cast votes in the machine and that the public counter count deviated from the difference between the beginning and ending counter on the protective counter. We consider together the evidence on these and on the instances we held had been improperly excluded.
In Ward 1, precinct 3A, appellant points to a difference in the protective counter numbers of 738 and a public counter number of 187 on one machine, a negative difference of 366 and a public counter number of 185 on another and concludes that serious irregularities are present. However, a transposition of the ending protective counter numbers and the public counter numbers between machines numbers 46604 and 46606 results in exact correlation between the protective counter differences and the public counter numbers. We find no serious irregularity.
In Ward 1, precinct 25, on machine number 43276 the difference between the beginning and ending protective counter numbers amounts to 53 while the public counter number was 243. The total number in the governor's race was 243. We ascribe the low protective counter difference to a mechanical failure rather than fraud or irregularity, since there is exact correlation between the public count and the total vote for governor. Furthermore, there was a *176 note that the protective counter strap had been broken by Elmo Villar, voting machine specialist of the state.
In Ward 1, precinct 28, on one machine the difference in protective counter numbers was 196 and the public counter number was 195. Here too a note had been made that Elmo Villar noted a broken protective counter strap. 563 signed the computer voting list and 562 was the total public counter numbers on the three machines at the precinct. We find no significance in the failure of one person to vote after signing the list. The maximum error is one.
In Ward 1, precinct 36A, the difference in the protective counter numbers on one machine was 52, when the public counter number was 248. The number of votes cast in the governor's race was 244. We ascribe the difference in the count as a mechanical malfunction. The numbers on the other three machines tallied exactly. 942 voters signed the polling list; the public counter numbers totalled 945. The maximum error we find to be 3.
In Ward 1, precinct 38A, the difference in the protective counter number on one machine was 139 and the public counter number was 136. 135 votes were cast in the governor's race. On the other machine the difference in the protective counter number was 143; the public counter number was 139, and the votes in the governor's race totalled 138. The maximum error therefore would have been 7.
In Ward 1, precinct 46B, the protective counter numbers difference on one machine was 62, the public counter was 117, and the vote in the governor's race was 119. A total of 715 signed the polling list and the public count on all machines was 688. The evidence did not contain the other relevant numbers. At least some of the difficulty in understanding the count was caused by the fact that the commissioners locked the machines too early. The maximum error is 27.
In Ward 1, precinct 61, the difference in the protective counter numbers was 81.
The public counter numbers was 205 and 205 votes were cast in the governor's race. We ascribe the insufficient difference in the protective counter number to a mechanical malfunction. Here also there was a note that the protective counter strap had been broken as per Elmo Villar. 595 voters signed the polling list, the public counter total on all machines was 597. There is a maximum error of 2.
In Ward 1, precinct 78B, the difference in the protective counter numbers on one machine was a negative 129. The number of the public counter was 260 and 260 votes were cast in the governor's race. We are unable to explain the negative difference but can find no irregularity because of the correlation of the public counter and the votes in the governor's race. We find no significance in the fact that 262 voters signed the polling list and 260 was registered on the public counter.
In Ward 1, precinct 82A, the difference in the protective counter numbers was 260, the public counter was 261 and 258 votes were cast in the governor's race. We find a maximum error of 1.
In Ward 1, precinct 82B, a malfunction in the public counter was reported. The figures on the machine showed a difference in the protective counter numbers of 268. The public counter showed a count of 258; however, a malfunction was discovered and reported. 276 votes were cast in the governor's race. We find a maximum error of 8.
In Ward 1, precinct 85A, the difference in the protective counter numbers was 186, the public counter number was 186 and the total of the votes cast for governor was 184. We find no error.
In Ward 1, precinct 88, the difference in the protective counter number was 224, the public counter number was 217 and the number of votes cast for governor totalled 244. A notation was made by the commissioners that the public count was "off by at least 7." The deviation between the difference in the protective counter numbers and *177 the total vote is unexplained. We find the maximum error to be 20.
In Ward 2, precinct 5B, on one machine the difference in the protective counter totals is 446, the public counter was 257 and the vote for governor was 254. In the precinct, 734 signed the list and the total on all public counters was 733. The difference in the protective counter numbers is unexplained but we can find no deviation serious enough to affect the outcome of the vote since the public counter number and the number of signatures of voters are so close.
In Ward 3, precinct 7, on one machine the difference in protective counter numbers came to 928, the public counter vote was 241 and the total vote for governor was 240. The first figure is unexplained but the closeness of the public counter and the votes cast for governor lead us to believe that it should be ascribed to human error not affecting the outcome of the election. The number of signatures was 727; the public counter numbers totalled 730. We find a maximum error of 3.
In Ward 2, precinct 9B, on one machine the difference in the protective counter number was 340, the public counter number was 190 and the vote for governor was 190. We are unable to account for the discrepancy in the protective counter number but in view of the correlation in the other two numbers, we can find no serious deficiency. 594 voters signed the polling list and 595 was the total of the public counter numbers on all machines. We find a maximum error of 1.
In Ward 2, precinct 18A, the difference in the protective counter numbers was 312, the public counter number was 313, and the total vote for governor was 307. We find a maximum error of 1.
In Ward 3, precinct 3A, the difference in the protective counter number was 317, the public counter number was 319 and the total vote for governor was 318. We find a maximum error of 1.
In Ward 3, precinct 3B, the difference in the protective counter number on one machine was 284, the public counter number was 273 and the votes for governor totalled 283. On another machine the difference in the protective counter number was 273, the public counter number was 284 and the total vote for governor was 273. The transposing of the public counter votes for these two machines results in exact correlation of the numbers in all three machines. We find no error.
Testimony by plaintiff's witness on Machines 37264, 37265 and 37266 at Ward 1, precinct 49A, on Machines 10875 and 10876 at Ward 1, precinct 92B, on Machines 10883 and 10884 in Ward 2, precinct 3A, and on Machines 10881 and 10882 in Ward 2, precinct 1B showed no deviation at all. The purpose of this testimony is obscure to say the least.
We ascribe no significance in the facts that 403 voters signed the voting list and only 402 voted in Ward 1, precinct 85A.
In Ward 2, precinct 6, the testimony was that 762 signed the voting list and the public counter showed 763. Our count of the voting list reveals that the number signing was 763. We find no error.
In Ward 1, precinct 37, the beginning and ending numbers on the protective counter of each of the three machines are identical. We believe this to be a human error in entering the numbers.
In summary, we find maximum errors to be 75.
Therefore, we believe that plaintiff's allegations of widespread irregularities and the media's statements regarding illegal voting in East Baton Rouge Parish to be without justification. It is good to strive for human perfection and the working of machinery without malfunction but it is impractical to expect it. We commend the electorate and the election commissioners who served in the October 27 election for the minimal errors we find. Almost all errors can be easily explained by simple human error and in mechanical malfunctions. *178 We believe that a statewide election should not be required to be held again on minimal mechanical malfunctions and in understandable human errors resulting from having commissioners late at night to be putting critical numbers of tabulations after having been at work since 5:30 a. m. The putting of the right numbers in the wrong blocks by tired election officials should not result in having elections rerun.

ASSIGNMENT OF ERROR NO. 10
Plaintiff claims that the votes on three machines should be disallowed, because the machines were sealed by the commissioners on election night and found unsealed when the warehouse was opened on Tuesday morning. The evidence so shows, but there is nothing to show that the vote count on these machines was in any way altered after having been sealed by the commissioners, or any other change in the readings taken on election night. We find no error in the contention.

ASSIGNMENT OF ERROR NO. 11
We have carefully examined the testimony with reference to the alleged voting irregularities in St. Helena Parish. Appellant relies primarily on that of Mr. Frank T. Scott. Mr. Scott testified as to alleged numerical differences between the numbers on the public counter and the numbers on the protective counters on the voting machines. On cross examination, his testimony was thoroughly discredited on the basis that he used the wrong line figures. In some instances, Mr. Scott's figures resulted in a negative vote. His testimony is, therefore, of no probative value and we find no merit in specification of error number 11.

ASSIGNMENT OF ERROR NO. 12
Plaintiff presented evidence showing that when the Clerk of Court of Lafourche Parish opened the voting machine warehouse on Tuesday morning, doors were open or the seals were broken on some eleven machines. In one machine, the voter precinct registration book bag was unzipped. None of the witnesses who testified knew of any voting machine tampering. We do not consider that irregularities of this nature in and of themselves are sufficient to upset an election without the showing of some disparity between the vote count on election night and the count when the machines are opened for inspection. Plaintiff has failed to prove any disparity of this nature, thus we find this assignment of error to be without merit.
It is clear from the foregoing analysis of plaintiff's evidence that there are not sufficient illegal votes, qualified persons prevented from voting, or other irregularities to make it impossible to determine the outcome of the election. As requested in plaintiff's specification of error number 2, we have examined the absentee ballots objected to by plaintiff, and find that the number thereof which should have been excluded by the trial judge is not sufficient to change the outcome of the election or to make it impossible to determine the outcome thereof. Since we are affirming the judgment below, we will not address ourselves to the complaints alleged in defendant Lambert's answer to the appeal.
The judgment appealed from is therefore affirmed at plaintiff's cost.
AFFIRMED.
CHIASSON, COVINGTON and LEAR, JJ., concur in the result.

*179
 APPENDIX "A"
 Protected Protected Total
Ward & Counter Counter Total Public For Max.
Pct. Machine End Beginning Difference Signatures Counter Gov. Error
-------------------------------------------------------------------------------------------------------------------
1-3A 46604 2360 1622 738 187 243
 46605 3122 2913 209 209
 46606 1807 2173 -366 185 186
1-25 43275 6567 6338 229 229 229
 43276 6788 6735 53 718 243 243 3
 43277 5865 5616 249 249 249
1-28 43283 5221 5128 93 196 195
 43285 3900 3713 187 563 187 187 3
 43284 5531 5352 179 179 179
1-36A 40105 9185 8964 223 223
 40106 8045 8097 -52 942 248 3
 40107 7991 7759 232 232
 40108 9258 9016 242 242
1-38A 40116 9401 9262 139 136 135 7
 40117 9011 8868 143 139 138
1-46B 37252 10114 9954 160 160
 37523 12135 11958 177 715 177 27
 37254 11317 11255 62 117
 37255 11302 11099 103 103
 37256 10588 10547 131 131
1-61 22080 15394 15313 81 205
 22081 16166 15973 193 595 193 2
 22082 14020 13821 199 199
1-78B 13062 18021 18150 -129 262 260 260 2
1-82A 13072 10038 9778 160 261 258 1
1-82B 13075 10279 10011 168 258 276 10
1-88 10865 19015 18802 213 213
 10866 17192 16968 224 217 244 20
2-5B 6747 17865 17612 243 253
 6748 17944 17498 734 257 1
 6749 19768 19545 223 223
2-7 6753 16447 16196 251 251
 6754 18382 17454 928 727 241 3
 6755 17251 17013 238 238
2-9B 6759 18034 17834 200 200
 6757 15716 17661 -1945 594 205 1
 6758 17851 15511 340 190
2-18A 5067 19026 18776 250 250
 5068 18135 17823 312 313 1
 5069 18750 18452 298 298
3-3A 5040 17321 17077 244 244
 5041 14915 14598 317 319
 5042 16470 16177 293 293 2
 5043 17555 17260 295 295
 5044 16665 16350 315 315
3-3B 5036 17750 17497 253 253
 5037 17927 17637 290 290
 5038 17726 17442 284 273
 5039 16482 16209 273 284

*180 ON MOTION TO DISMISS
PER CURIAM.
For reasons to be assigned, the motion to dismiss is denied, at defendant Lambert's cost.
MOTION DENIED.
LOTTINGER, J., concurs and assigns reasons.
COVINGTON, CHIASSON and LEAR, JJ., dissent and assign reasons.
PER CURIAM.
For reasons to be assigned, the judgment appealed is affirmed at plaintiff's cost.
AFFIRMED.
COVINGTON, CHIASSON and LEAR, JJ., concur in the result.

ON MOTION TO DISMISS
LOTTINGER, Judge, concurring.
I concur with the result, though agree with the reasoning of the dissent.
A mere casual reading of the Election Code, Act 697 of 1976, convinces me that the legislature realized and intended that "time be of the essence" in election contest cases.
The dissenters are correct in their determination of when the appeal time commences and ends. However, because of confusion and uncertainty caused by Waguespack v. Richard, 220 La. 661, 57 So.2d 220 (1952) and Buras v. Plaquemines Parish Democratic Executive Committee, 202 So.2d 678 (La.App. 4th Cir. 1967), the apparent intendment of the legislature in the Election Code that time is of the essence, that appeals are favored and courts should protect a party litigant's right to appeal, I would only apply the determination of the dissenters prospectively.
COVINGTON, CHIASSON AND LEAR, Judges, dissenting:
We are of the opinion that the appeal should have been filed on Monday, November 12, 1979, and therefore, that the motion of appellee, Lambert, to dismiss the appeal as being untimely, should have been granted. Even in the absence of said motion, this court, ex proprio motu, should have dismissed it. It is a jurisdictional question and we cannot confer jurisdiction upon ourselves.
The pertinent chronological sequence of events, all occurring, of course, in 1979, is:
Saturday, November 10at the conclusion of the plaintiff's case, the trial court granted a directed verdict for the defendant, with three pages of oral reasons, the last paragraph thereof reading: "The motions for directed verdict are granted as to both defendants and the case is dismissed." The majority opinion reflects the minute entry on that date.
Tuesday, November 13at 10:27 A.M., appellant filed a motion and order for appeal which states, inter alia, that "Plaintiff desires to appeal pursuant to La.R.S. 18:1409 B from the judgment rendered in the above cause on the 10th day of November, 1979, in favor of the Defendants." (Emphasis added.)
Tuesday, November 13at 12:39 P.M., appellee filed a motion to dismiss the appeal as being untimely.
Tuesday, November 13at 2:20 P.M., a judgment, recited in the majority opinion, was signed by the trial court.
Tuesday, November 13at 2:45 P.M., appellant filed a second motion and order for appeal, reciting that he desires to appeal from the "judgment rendered and signed in the above cause on the 13th day of November, 1979."
Wednesday, November 14appellee moved to dismiss this "second appeal" as being untimely.
In both of the orders of appeal, bond was set at the same amount $8000.00.
In oral argument before this court, appellant's counsel candidly acknowledged that they had erroneously considered that Monday, November 12, was a legal holiday. A reading of LSA-R.S. 1:55, and particularly Sub-section A (4) and E, confirms that it *181 was not a holiday in the absence of an executive proclamation by the Governor, LSA-R.S. 1:55 B (3). No such proclamation was issued. This court was open and staffed and certainly a duty judge was in the 19th Judicial District Court. There was some oral argument, dehors the record, that the Judicial Administrator declared it a court holiday. We are not aware of his authority to do so; LSA-R.S. 1:55. If in fact that did occur, such action contributed to a major portion of the difficulty in our resolution of this controversy. Under LSA-R.S. 1:55 E, the office of the Clerk of Court had to be open on November 12.
The crucial questions then, procedurally, are governed by LSA-R.S. 18:1409, i. e., whether the judgment was "rendered" at the conclusion of the trial on November 10, and by LSA-R.S. 18:1413. Section 1409 A, in pertinent part, reads as follows: "The court shall render judgment within one day after the trial commences." Section 1409 B and Section 1413 have been quoted in the majority opinion.
In the interpretation of a statute, words should be given their ordinary meanings. The rendition of a judgment is accomplished when the trial judge pronounces, declares, or announces the judgment in a given case or on a given state of facts.
In interpreting the statutes relating to an election contest we are governed by firmly established jurisprudence which was concisely expressed by our Supreme Court in the case of State ex rel. Vullo v. Plaquemines Parish Police Jury, 238 La. 328, 115 So.2d 368 (1959), as follows:
"It is a universal rule in this country that the validity of an election contest as well as the machinery controlling such elections presents political rather than judicial questions, in the absence of an express constitutional or statutory provision granting to the courts jurisdiction over the controversy. In conformity with the mandate of the Constitution of this State the Legislature adopted its Act 46 of 1940, the provisions of which were incorporated substantially in their original form in the Revised Statutes of 1950 as R.S. 18:281 et seq., and the procedures therein contained are sui generis. . ." (Emphasis added.)
See also: Downs v. Pharis, 240 La. 580, 124 So.2d 553 (1960); Fuselier v. Bertrand, 129 So.2d 583 (La.App. 3d Cir., 1961); and Allen v. Gleason, 293 So.2d 267 (La.App. 2d Cir., 1974).
In Vullo, supra, the Supreme Court refused to apply the general provision of the Code of Practice in an election contest. We feel that the majority falls into error when, in the instant case, they apply C.C.P. Articles 1911 and 2083.
We also consider the present Election Code, Act 697 of 1976, effective January 1, 1978, to be sui generis. One obvious intent of the legislature in enacting that Code is the prompt and expeditious disposition of election contests. To hold that the oral dismissal of plaintiff's suit on November 10, referred to as a "rendition" in appellant's first motion and order of appeal, was not in fact a rendition, beginning the tolling of the one day allotted for appellant to appeal under LSA-R.S. 1409 B, could establish a precedent leading to absurd consequences. Rather than expediting a conclusion of the matter, delay in obtaining a signed judgment could be extended, for whatever reason, for days or weeks, and thus thwart an obvious primary intent of the law. Parenthetically, we are not suggesting that undue delay was intended by any party in this case.
We fully realize the solemnity and importance of this contest. However, the magnitude of the prospective office does not warrant disregard for the written law, no matter what our philosophical inclination might be. While in this case "only" one day is involved, major claims, even tort claims involving death, are often dismissed because they are filed "only" one day late. A lamentable precedent should be avoided.
Waguespack v. Richard, 220 La. 661, 57 So.2d 220 (1952), cited by the majority opinion, is inapposite. The quoted portion thereof is dicta; the matter at issue was whether or not an appeal could be taken from a ruling on the admissibility of evidence.
*182 There had not even been a rendition of judgment.
For these reasons, we respectfully dissent.
PER CURIAM.
On Saturday, November 10, 1979, after plaintiff rested his case, defendants Louis J. Lambert, Jr. and David Treen each moved for a directed verdict pursuant to C.C.P. art. 1810. The court's minute entry on November 10th recites that ". . . for oral reasons assigned, the motions for directed verdict were granted, and the plaintiff's suit was dismissed at plaintiff's costs."
The fact that Sunday, November 11th, was a legal holiday and that Monday, November 12th, was not a legal holiday is uncontested by the parties to this suit. La.R.S. 1:55. We note, however, that a "holiday" had administratively been declared by the Nineteenth Judicial District Court for Monday, November 12th.
On Tuesday, November 13th, plaintiff filed with the trial court a motion for appeal "from the judgment rendered in the above cause on the 10th day of November, 1979, in favor of Defendants." The appeal was granted. Defendant, Louis J. Lambert, Jr., immediately filed in this court a motion to dismiss urging that the appeal was not timely. Thereafter, but still on Tuesday, November 13th, a written judgment was signed by the trial judge. It stated:
IT IS ORDERED that for oral reasons assigned that judgment be rendered in favor of Defendants, Louis J. Lambert, Jr., David Treen, H. M. "Mike" Cannon, and Paul J. Hardy, against Plaintiff, James E. Fitzmorris, Jr., dismissing Plaintiff's suit at his costs.
READ, RENDERED AND SIGNED this 13th day November, 1979.
Later in the day of November 13th, plaintiff filed a second motion for appeal "from the judgment rendered and signed in the above cause on the 13th day of November, 1979." Again, an appeal was granted by the court and defendant, Louis J. Lambert, Jr., moved to dismiss this "second" appeal.
It is argued by defendant Lambert that the judgment was rendered on November 10, 1979, and that, under the provisions of La.R.S. 18:1409(B) a motion for appeal filed on November 13, 1979, comes too late. La.R.S. 18:1409(B) provides:
Within one day after rendition of judgment, a party aggrieved by the judgment may appeal by obtaining an order of appeal and giving bond for a sum fixed by the court to secure the payment of costs. The clerk of the trial court shall give notice of the order of appeal to the clerk of the court of appeal and to all the parties or their counsel of record.
La.R.S. 18:1413 provides:
Computation of all time intervals in this Chapter shall include Sundays and other legal holidays. However, if the final day in a time interval falls on a Sunday or other legal holiday, then the next legal day shall be deemed to be the final day of the time interval.
Plaintiff argues that the judgment was not rendered on November 10th, when it was pronounced in open court by the judge, but on November 13th, when it was signed. C.C.P. art. 1911. He reasons that the "second" appeal taken on November 13th from the judgment signed on that day is timely under La.R.S. 18:1409(B).
The question now presented to us is whether the language of La.R.S. 18:1409(B) is correctly interpreted to mean that "rendition of judgment" occurs when the judgment is reduced to writing and signed by the trial judge or whether it occurs when judgment is orally pronounced in Court. The Election Code affords no aid in resolving the issue. We turn to sources outside the Election Code to find the answer.
C.C.P. art. 2083 provides:
An appeal may be taken from a final judgment rendered in causes in which appeals are given by law whether rendered after hearing or by default, and from an interlocutory judgment which may cause irreparable injury.
C.C.P. art. 1911, as amended by Act 618 of 1979, provides:

*183 Except as otherwise provided by law, every final judgment shall be signed by the judge. For the purpose of an appeal as provided in Article 2083, no appeal may be taken from a final judgment until the requirement of the Article has been fulfilled.
Although it may be argued that the election laws are sui generis, we note that both La.R.S. 18:1409(B) and C.C.P. art. 2083 employ the same terminology relative to appeals. The former states that "Within one day after rendition of judgment, a party aggrieved by the judgment may appeal. ." The latter states "An appeal may be taken from the final judgment rendered in causes in which appeals are given by law whether rendered after hearing or by default, . . ." Also, La.R.S. 18:1409(A) provides "The court shall render judgment within one day after the trial commences."
When the legislature amended C.C.P. art. 1911 by Act 618 of 1979, express reference was made to C.C.P. art. 2083 which defines judgments that may be appealed. Reading these articles and the Election Code in pari materia, we conclude the plaintiff in this case can appeal the final judgment rendered November 10, 1979, but not until it is signed by the trial judge. It is not "otherwise provided by law" in the Election Code and C.C.P. art. 1911, being the latest expression of our legislature dealing with appeals, controls the procedure in this case. With both the Election Code and the articles of the Code of Civil Procedure speaking in terms of "render," "rendered," and "rendition," we think it logical to apply basic procedural law to determine when an appeal may be taken after rendition of a judgment in an election contest.
Orderly procedure, in our opinion, requires a written, signed judgment. The minute entry in this case noting the action of the court on November 10th does not provide for the details of the judgment that was later signed and filed. A comparison of the minute entry and the signed judgment demonstrates the need for a signed judgment to adjudicate relief to all parties. A signed judgment also eliminates the confusion that often arises in open court relative to intent of the trial judge to either adjudicate or simply give oral reasons. In this case it was apparently the intent of the trial judge to render judgment on November 13th. His judgment reads:
IT IS ORDERED that for oral reasons assigned that judgment be rendered . . .
This portion of the judgment is followed by adjudicatory language.
Although decided many years prior to the adoption of our current Election Code, the reasoning, albeit dicta, found in the election case of Waguespack v. Richard, 220 La. 661, 57 So.2d 220 (1952), is still valid within the context of the present facts and law:
Accordingly, in an election contest like any other civil suit, judgment must be rendered in order for the cause to be appealable. And the result would be the same, even if it be conceded that the maintenance of the objection to the admissibility of the boxes in evidence has the force of a judgment, as it is well settled that an appeal will not lie from a final judgment until it has been signed. (Emphasis added.)
The law favors appeals and in this instance we hold that appellate review is properly before this court. The motion to dismiss is denied.
MOTION DENIED.
LOTTINGER, J., concurs and assigns written reasons.
CHIASSON, COVINGTON and LEAR, JJ., dissent for reasons assigned.
NOTES
[1] § 1405(B)

An action contesting any election involving election to office shall be instituted within five days after the date of the election, and no such contest shall be declared moot because of the performance or nonperformance of a ministerial function, including but not limited to matters relating to the printing of ballots for the general election.
[2] § 1409

A. Actions objecting to candidacy or contesting an election shall be tried summarily, without a jury, and in open court. The trial shall begin at 10:00 a. m. on the fourth day after suit was filed. If the defendant does not appear on the date set for the trial, either in person or through counsel, the court shall appoint an attorney at law to represent him by instanter appointment made prior to the commencement of the trial. In a case where a court appointment of an attorney to represent the defendant is made, the proceedings shall be conducted contradictorily against the court appointed attorney. The court shall determine the amount of the fee payable to curators ad hoc in accordance with criteria used by the court in fixing curator fees under Code of Civil Procedure Article 5091, et seq. The court shall tax the curator's fee as costs, and such fee shall be paid by the plaintiff unless the defendant was served personally and the appointment of a curator ad hoc was necessitated by his failure to appear at the trial, in which case the court may require the defendant to pay the curator's fee. The court shall render judgment within one day after the trial commences.
B. Within one day after rendition of judgment, a party aggrieved by the judgment may appeal by obtaining an order of appeal and giving bond for a sum fixed by the court to secure the payment of costs. The clerk of the trial court shall give notice of the order of appeal to the clerk of the court of appeal and to all the parties or their counsel of record.
C. The clerk of the trial court shall prepare the record on appeal and transmit it to the clerk of the court of appeal within one day after the order of appeal is granted.
D. Immediately upon receipt of the record the clerk of the court of appeal shall notify the parties and the case shall be heard no later than the second day after the record was received, whether or not the appeal has been actually lodged. Judgment shall be rendered within one day after the case is argued.
E. An application to the supreme court for a writ of certiorari shall be made within two days after judgment is rendered by the court of appeal.
F. Except as otherwise provided by Article V, Section 8 of the 1974 Constitution, no application for a new trial or for a rehearing shall be entertained by any court, but a court, upon its own motion, may correct manifest error to which its attention is called.
[3] Art. 1, § 2

Section 2. No person shall be deprived of life, liberty, or property, except by due process of law.
Art. 1, § 22
Section 22. All courts shall be open, and every person shall have an adequate remedy by due process of law and justice, administered without denial, partiality, or unreasonable delay, for injury to him in his person, property, reputation, or other rights.
[4] R.S. 18:1406 A:

"An action objecting to candidacy or contesting an election shall be instituted by filing a petition in a competent court and posting a copy of the petition in a conspicuous place at the entrance of the office of the clerk of court where the petition is filed. The petition shall set forth in detail the grounds for the objection or contest."
[5] "(c) In East Baton Rouge Parish irregularities occurred in the counting and tabulation of votes amounting to at least 4,436 votes which were cast iregularly (sic) or in error for Petitioner and/or defendant Lambert. (See Attachment `A')

"(d) Petitioner is informed that in two precincts (Ward 2, Precinct 6 and Ward 1, Precinct 85) in East Baton Rouge Parish and in 17 or more other precincts in East Baton Rouge Parish there were more votes tabulated than people who signed the polling list that day to vote."
[6] the three wards of East Baton Rouge and the Parishes of Ascension, Livingston, St. Landry, Tangipahoa, Calcasieu, Lafourche, St. Helena and West Feliciana, the number of persons who appeared at the polls to vote on October 27, 1979 differs from the number of votes registered on the machine either higher or lower indicating that either votes were cast and not counted or counted but not cast in an amount sufficient to make it impossible to determine the results of the election."